Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
Telephone (808) 521-3367
Facsimile 808-521-3369
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, California 92123
Telephone (619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOHN TERRY, MICHAEL A. COBB JR, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 1:24-cv-00248- |
| HONOLULU CITY AND COUNTY ) | JAO-RT |
| ) | VERIFIED AMENDED |
| Defendant ) | COMPLAINT |
| ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |

<u>**VERIFIED COMPLAINT FOR DECLARATORY**</u>
<u>**AND INJUNCTIVE RELIEF**</u>

COME NOW the Plaintiffs, JOHN TERRY and MICHAEL A. COBB JR., by and through their undersigned counsel, and complain of the Defendant as follows:

<u>**I**</u>

<u>**PARTIES**</u>

**Plaintiff JOHN TERRY**

1. Plaintiff John Terry (Terry) is a natural person, an adult male resident of the State of Hawaii and resides in Honolulu County and is a citizen of the United States. But for the actions of Honolulu County (County) challenged in this lawsuit, he would have a carry concealed weapon license or permit "CCW" without having been told to obtain a new medical clearance letter;

2. Plaintiff Michael A. Cobb Jr. (Cobb), is a natural person, an adult male resident of the State of Hawaii and resides in Honolulu County and is a citizen of the United States.  In order to obtain a Permit to Acquire "PTA", Cobb was forced to provide an updated medical clearance letter, and but for the actions of Defendant, he would have had a PTA without having to acquire a new medical clearance letter;

**Defendant**

3.  Defendant City and County of Honolulu ("County") is a municipal

corporation incorporated under the laws of the State of Hawaii. County is

authorized by law to control and maintain the Honolulu Police Department,

an agency of the County, who acts on County's behalf in the area of law

enforcement.  County is therefore ultimately responsible for Honolulu Police

Department ("HPD"), and their actions, and therefore, must assume the risks

incidental to the maintenance of HPD, their employees, laws, customs and

policies. County can be served by serving the Department of the Corporation

Counsel, Honolulu County at 530 South King Street, Suite 110, Honolulu,

Hawaii 96813;

## II

## <u>JURISDICTION AND VENUE</u>

4.  This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. §§1331, 1343, 2201, 2202 and 42 U.S.C. §1983 and §1988;

5.  Venue lies in this Court pursuant to 28 U.S.C. §1391;

## III

## <u>INTRODUCTION</u>

6.  This action challenges the constitutionality of concealed carry weapon

permit (CCW) and Permit To Acquire (PTA) issuance policies, actions,

rules, and or customs of County that make it extremely difficult and

impermissibly time consuming and expensive, for Plaintiffs, and others like them, to obtain permits to acquire and permits to carry a concealed firearm in public and therefore to exercise their right to be armed, and armed in public, as guaranteed by the Second Amendment's text "bear arms," and as recognized and reaffirmed by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022);

7.  The main policies, actions, and customs that Plaintiffs target and allege are unconstitutional here are Defendant's failure or refusal to issue or grant a Concealed Weapon Permit (CCW) and or a Permit To Acquire (PTA) to a person who has previously provided a so-called "medical clearance" document that shows that the applicant is no longer adversely affected by alcohol and or any other disqualifying condition; and or Defendant's failure or refusal to issue or grant a CCW or PTA to a person who had previously provided a so-called "medical clearance" document, without the applicant having received and provided to the HPD a new so-called "medical clearance document" or the applicant having taken action to and submitting documentation to HPD showing "re-certification" of the so-called "medical clearance" letter;

8.  These practices, rules, customs, habits and policies, violate the Second and Fourteenth Amendments.

9.   In anticipation of bad-faith efforts to obstruct its ruling in recalcitrant

jurisdictions, the *Bruen* Court expressly invited challenges such as this one,

noting that, "**because any permitting scheme can be put toward *abusive***

***ends, we do not rule out constitutional challenges to *shall-issue*[1] regimes***

**where,** for example, lengthy wait times in processing license applications

or exorbitant fees deny ordinary citizens their right to public carry." *Id*.

(emphasis added).  The policies that Plaintiff challenges have gone far

beyond "abus[ing]"constitutional rights. Defendant has flat-out denied

Plaintiffs rights to be armed, and armed outside of their homes by

establishing an onerous permitting regime replete with subjective and

discretionary decisions, poll tax-like fees, and as applicable to this lawsuit,

having to obtain previously obtained documents, specifically in this case, so-

called "medical clearance" documents, again, and or to "re-certify" a

previous so-called "medical clearance" letter which is designed to flout the

---

[1] Plaintiff does not characterize, concede or agree that Hawaii and Honolulu are "shall issue" jurisdictions.  Hawaii and Honolulu do not allow a person to acquire a firearm without police permission or open carry without a license which requires the applicant prove "urgency" or "need" as well as the applicant being "engaged in the protection of life and property".  Hawaii and Honolulu require a "permit to acquire a firearm", a PTA, and a "license", referred to herein as a CCW, to carry an arm concealed, but have burdened the applicant with forms, tests, invasive and costly procedures and waiting times, amongst other abusive bureaucratic tactics. Hawaii and Honolulu are not "shall issue" CCW and PTA jurisdictions.

Supreme Court's precedents and add inconvenience and or cost to the process.

## IV

## STATEMENT OF LAW

## A

## SECOND AMENDMENT

10. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.";

11. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 1027 (2016);

12. Firearms are protected by the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570 (2008);

13. The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010). "[T]he

Second Amendment extends, prima facie, to all instruments that constitute
bearable arms, even those that were not in existence at the time of the
founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).  The
Fourteenth Amendment to the United States Constitution provides in
pertinent part: No state shall make or enforce any law which shall abridge
the privileges or immunities of citizens of the United States; nor shall any
state deprive any person of life, liberty, or property, without due process of
law; nor deny to any person within its jurisdiction the equal protection of the
laws.

14. "[T]he Second Amendment guarantees a general right to public carry,"
meaning ordinary, law-abiding citizens may "'bear' arms in public for self-
defense." *Bruen*, 142 S.Ct. at 2135;

15.  *Heller* established a "text, history, and tradition" framework for
analyzing Second Amendment questions. *See Bruen*, 142 S. Ct. at 2127-29,
citing *Heller*, 554 U.S. at 634. Under that framework, the *Heller* Court
assessed historical evidence to determine the prevailing understanding of the
Second Amendment at the time of its ratification in 1791. Based on that
assessment, the Court concluded that the District of Columbia statute which
prohibited possession of the most common type of firearm in the nation (the
handgun) lacked a Revolutionary-era tradition, did not comport with the

historical understanding of the scope of the right, and therefore violated the
Second Amendment;

16.  In *Bruen*, the Supreme Court held unconstitutional New York's "good
cause" licensing requirement because a State may not condition the right to
publicly carry handguns on a citizen's "special need for self-defense."
*Bruen*, 142 S.Ct. at 2135 n.8;

17.  The "general right to public carry" cannot be restricted absent
"*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2156 (emphasis added).
This is because the Second Amendment "presumptively protects" carrying
firearms. *Id.* At 2129. To determine whether a state's restriction is
constitutional, the Court in *Bruen* explained that "the standard for applying
the Second Amendment is as follows: When the Second Amendment's plain
text covers an individual's conduct, the Constitution presumptively protects
that conduct. The government must then justify its regulation by
demonstrating that it is consistent with the Nation's historical tradition of
firearm regulation." 142 S.Ct. at 2129;

18.  It is the State's burden to "affirmatively prove that its firearms
regulation is part of the historical tradition that delimits the outer bounds of
the right to keep and bear arms." 142 S.Ct. at 2127; *see also id.* At 2150
("[W]e are not obliged to sift the historical materials for evidence to sustain

New York's statute. That is respondents' burden."). If the State fails to meet its burden, then the State's restrictions must be enjoined;

19.  The *Bruen* Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. In doing so, *Bruen* explicitly rejected New York's attempt to justify its restriction as analogous to a historical "sensitive place" regulation. 142 S.Ct. at 2133-34. The Court explained that a state may not simply ban guns wherever people may "congregate" or assemble. A rule that "expand[ed] the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." 142 S.Ct. at 2134. As the Court explained, "[p]ut simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id;*

20.  It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution. *Frost & Frost Trucking Co. v. Railroad Comm'n of California*, 271 U.S. 583, 593-94 (1926).  "Constitutional rights would be of little value if they could be . . . indirectly denied" (*Smith v. Allwright*, 321 U.S. 649, 664 (1944)), or "manipulated out of existence." *Gomillion v. Lightfoot*, 364 U.S. 339, 345

(1960). "Significantly, the Twenty-Fourth Amendment does not merely insure that the franchise shall not be 'denied' by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be 'denied or abridged' for that reason." *Harman v. Forssenius*, 380 U.S. 528, 540 (1965) (citation omitted). Thus, like the Fifteenth Amendment, the Twenty-Fourth "nullifies sophisticated as well as simple-minded modes" of impairing the right guaranteed. *Lane v. Wilson*, 307 U.S. 268, 275 (1939). " 'It hits onerous procedural requirements which effectively handicap exercise of the franchise by those claiming the constitutional immunity.' " *Harman*, 380 U.S. at 540-41 (citations omitted), quoting *Lane*, at 275.

21.   *Bruen* further establishes several requirements to determine whether a historical regulation is sufficiently analogous. First, the relevant time period for the historical analogue must be the Founding, centering on 1791. *Bruen*, 142 S.Ct. at 2135-36. That is because "'[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'"  *Bruen*, 142 S.Ct. at 2136, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008).   "20th century and late 19th century statutes and regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S.Ct. at 2154 & n.28;

22.  Thus, restrictions on the right to keep and bear arms dating after the

Civil War and after the adoption of the Fourteenth Amendment in 1868 may

be confirmatory of earlier legislation but cannot be used alone to provide the

appropriate historical analogue required by *Bruen*.  Legislation, history and

events following the Civil war can confirm but cannot limit, reduce or

infringe upon the rights as understood in 1791.  In other words, only those

restrictions with roots at the time of the Founding are sufficiently "enduring"

and "well-established" to comport with the Second Amendment's

"unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar of*

*Cal.*, 366 U.S. 36, 50 n.10 (1961));

23.  Second, the historical analogue must be "representative." Historical

"outlier" requirements of a few jurisdictions or of the Territories are to be

disregarded.  *Bruen*, 142 S.Ct. at 2133, 2153, 2147 n.22 & 2156.  Courts

should not "uphold every modern law that remotely resembles a historical

analogue," because doing so "risk[s] endorsing outliers that our ancestors

would never have accepted."  *Drummond v. Robinson,* 9 f.4th 217 (3rd. Cir

2021),- individual self-defense is the central component of the Second

Amendment right;

24.  Third, the historical analogue must be "relevantly similar," which is to

say that it must burden ordinary, law-abiding citizens right to carry in a

similar manner and for similar reasons and at a similar level of severity. *Bruen*, 142 S. Ct. at 2132. *Bruen* thus held that the inquiry into whether a proper analogue exists is controlled by two "metrics" of "how and why" any restriction was historically imposed during the Founding era. *Id.* at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry." *Id.* (emphasis in original). "[T]o the extent later history contradicts what the text says, the text controls." *Id.* at 2137. "Thus, 'post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id*., quoting *Heller v. District of Columbia*, 670 F.3d , 670 F.3d 1224, 1274, n.6 (Kavanaugh, J., dissenting);

25.  Fourth, the historical analysis required by the Supreme Court is fundamentally a legal inquiry that examines legal history, which is appropriately presented in briefs. *See Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "legal questions" that judges can address) (emphasis in original); *see also id*. at 2135 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling

did not "depend on any of the factual issues raised by the dissent").

Accordingly, the required analysis does not require fact-finding by a court;

26.  The text of the Second Amendment, as authoritatively interpreted by the Supreme Court, indisputably covers possession (keep) and the wear, carry, and transport (bear) of firearms, including handguns by ordinary, law-abiding citizens.  The State bears the burden to demonstrate that there is an enduring, well-established, representative historical analogue to the restriction imposed by the government. And the historical analogue must be "relevantly similar" to the contemporary restriction imposed by the government, burdening the Second Amendment right in a similar manner and for similar reasons. Under this test established in *Bruen*, County cannot meet its burden to justify its denial or delay in the issuance of CCW or PTA permits.  There is no historical analogue of <u>any</u> delay in the issuance of CCW[2] or PTA;

---

[2] There is also no historical analogue allowing the government to infringe on being able to acquire and or able to carry arms through a licensure or permitting process at all or with any delay and or subject to bureaucratic discretion.  It may be that certain persons are disallowed from possession or carriage of an arm, but that is vastly different than seeking permission to exercise a right at the present and in the future and to be forced to endure an invasive, onerous, expensive, subjective, time-consuming process.  This current lawsuit does not attack the general concept of a licensure system for acquiring an arm and or carrying concealed, or unconcealed, but notes that Hawaii and County have made it so that open carry is all but impossible for the average person, and subject to the Chief's discretion and carrying concealed requires an applicant to proceed through onerous requirements

27.  "Both the modern restriction and its historical precursor allow for complete but temporary disarmament on a narrow subset of the population: criminal defendants awaiting trial for their alleged, serious crimes." *U.S. v. Perez-Garcia*, 96 F.4th 1166, 1184 (9th Cir. 2024). However, there is no such historical precursor for a permanent restriction for past alcohol issues and or diagnoses;

28. Restrictions on alcohol users "only applied while an individual was actively intoxicated or actively using intoxicants." *U.S. v. Harrison*, 654 F. Supp. 3d 1191, 1200 (W.D. Okla. 2023)- the same is true for other "disqualifying" conditions;

## **STATEMENT OF LAW**

## **B**

### **Fourteenth Amendment**

29. The Due Process states that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor

---

and discretionary issuance.  If one method of carry, unconcealed, has hurdles and some governmental discretion, then the other manner, concealed, must be accomplished through merely ministerial application of objective measures such as ensuring that the applicant has not already been determined, after a robust judicial process, that he is currently too dangerous to be allowed to carry an arm or arms for some specific reason or generally.  The acquisition of arms is not subject to government permission or pre-approval-especially for someone the government previously knows does not have a disqualifying condition.

shall any State deprive any person of life, liberty, or property, without due process of law". *See* U.S. Const. amend. XIV, § 2;

30. To demonstrate a claim for procedural due process a litigant must fulfill the test laid out in *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976). This test requires that we balance: "(1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; (3) the government's interest, including the possible burdens of alternative procedures." Id.  30. Plaintiffs have a valid liberty interest in their constitutional right to carry a weapon concealed[3] or to acquire a weapon;

31.  Plaintiffs have a fundamental constitutional interest in the carry of their firearms and in the acquisition of arms;

32. The County has violated Plaintiffs' Due Process Rights. This is because the County's requirement that Plaintiffs must get an additional medical

---

[3] *Bruen* made clear that a state can choose to have minimal, objective requirements in order to carry in a particular mode, "shall issue", whether unconcealed or concealed, but cannot make one mode onerous and difficult to exercise and the other mode effectively denied.  Hawaii and County have made it so that open or unconcealed carry is extremely limited and is in no way a general right to carry and have erected numerous obstacles to concealed carry- the most facile of which is to require applicants to keep re-proving their eligibility, effectively shifting the burden on applicants to exercise a right. With regard to acquiring an arm, there is no tradition of a person having to seek governmental pre-approval to exercise a right.

clearance is sufficiently arbitrary to violate due process. Moreover, this requirement is ultra vires. And ultra vire conduct is inherently arbitrary. *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 790 (2d Cir. 2007);

33. There is a great risk of erroneous deprivation because County has no basis to form a determination that Plaintiffs currently are suffering from alcohol abuse and or any other disqualifying condition. And it already has evidence that Plaintiffs are not suffering from a disqualifying condition in the form of the medical clearance it already has on file.

34. Furthermore, County has no interest in requiring an additional medical clearance letter because it already has a medical clearance letter on file.

35. Thus, County has violated Plaintiffs' Due Process rights;

36. Plaintiffs allege that requiring Plaintiffs to submit another or a new so-called "medical clearance letter", before the issuance of CCW and or a PTA is unconstitutional and County has violated the Second and Fourteenth Amendment rights of Plaintiffs;

37. Plaintiffs alleges that County has no evidence that Plaintiffs have been judicially determined to be currently sufficiently dangerous so as to legally prohibit them from possessing arms or carrying arms;

38. Plaintiffs alleges that County has no evidence that Plaintiffs have been judicially determined to be currently dangerous so as to legally prohibit them

from possessing and or carrying a weapon concealed pursuant to HRS and HRS 134-9[4];

39.   Plaintiffs alleges that County has no evidence that Plaintiffs currently are adversely affected by any addiction to, abuse of, or dependence upon any dangerous, harmful, or detrimental drug, intoxicating compound as defined in Hawaii Revised Statutes section 712-1240 or intoxicating liquor and or any other disqualifying condition;

40.   Plaintiffs alleges that Defendant does not need a new or more recent so-called "medical clearance" letter or any letter to "re-certify" that Plaintiffs no longer suffers from any disqualifying condition under any state statute or County rule;

41. Plaintiffs alleges that County has no evidence that Plaintiffs have been involved in any incidents of abuse of alcohol, intoxicating liquor, or controlled substances, including but not limited to operating a vehicle under the influence of an intoxicant;

## **STATEMENT OF LAW**

## **C**

### **H.R.S. §134  Firearms**

---

[4] This allegation includes reference to any Honolulu Police Department Rule that flows from HRS 134-9 that pertains to the issuance of CCW and or PTA by County.

42. Hawaii law, specifically Hawaii Revised Statutes Section 134 *et seq*, is a comprehensive set of laws covering all aspects of firearms in Hawaii including everything from acquisition, possession, ownership, usage and carriage of arms[5];

43. Prior to the United States Supreme Court decision in *Bruen*, Hawaii law, specifically HRS 134-9, dealt with the carriage of weapons, and it read-,

" **§134-9  Licenses to carry.**  (a)  In an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property, the chief of police of the appropriate county may grant a license to an applicant who is a citizen of the United States of the age of twenty-one years or more or to a duly accredited official representative of a foreign nation of the age of twenty-one years or more to carry a pistol or revolver and ammunition therefor concealed on the person within the county where the license is granted.  Where the urgency or the need has been sufficiently indicated, the respective chief of police may grant to an applicant of good moral character who is a citizen of the United States of the age of twenty-one years or more, is engaged in the protection of life and property, and is not prohibited under section 134-7 from the ownership or possession of a firearm, a license to carry a pistol or revolver and ammunition therefor unconcealed on the person within the county where the license is granted.  The chief of police of the appropriate county, or the chief's designated representative, shall perform an inquiry on an applicant by using the National Instant Criminal Background Check System, to include a check of the Immigration and Customs Enforcement databases where the applicant is not a citizen of the United States, before any determination to grant a

---

[5] Hawaii state laws regarding all aspects of the Second Amendment and firearms are thorough, oppressive, and comprehensive.  Yet, Hawaii does not have an explicit preemption law that limits regulation to the state and in several circumstances allows or mandates that counties promulgate additional regulations, restrictions and processes.

license is made.  Unless renewed, the license shall expire one year from the date of issue.

(b)  The chief of police of each county shall adopt procedures to require that any person granted a license to carry a concealed weapon on the person shall:

(1)  Be qualified to use the firearm in a safe manner;

(2)  Appear to be a suitable person to be so licensed;

(3)  Not be prohibited under section 134-7 from the ownership or possession

of a firearm; and

(4)  Not have been adjudged insane or not appear to be mentally deranged.

(c)  No person shall carry concealed or unconcealed on the person a pistol or revolver without being licensed to do so under this section or in compliance with sections 134-5(c) or 134-25.

(d)  A fee of $10 shall be charged for each license and shall be deposited in the treasury of the county in which the license is granted.";

44.  Following *Bruen*, the state of Hawaii promulgated new laws regarding firearms, making all aspects of the exercise of Second Amendment rights much more difficult, onerous and expensive.  One aspect of the laws passed by the state of Hawaii dealt with CCW, but that law took effect on January 1, 2024.  Additionally, County promulgated new Chief Rules effective January 12, 2024.  Plaintiffs herein applied after *Bruen* and after January 12, 2024;

45.  Following *Bruen*, the state of Hawaii promulgated new rules regarding CCW and PTA.  Some of these new rules went into effect in June 2023 and others in January 2024.  The rules regarding the issuance of CCW went into effect on January 1, 2024.  The State of Hawaii Rules under HRS 134 et seq, are attached as Exhibit 1[6].  The Honolulu County Rules, effective January 12, 2024, are attached as Exhibit 2.

## STATEMENT OF LAW

## D

## County specific rules regarding PTA/CCW

---

[6] HRS 134 *et seq*, are the statewide rules pertaining to the acquisition, ownership, possession and carriage of weapons generally.  There are other laws in place, not applicable here, the involve firearms, in, for example, the penal code, such as HRS §707-713  Reckless endangering in the first degree.  (1)  A person commits the offense of reckless endangering in the first degree if the person employs widely dangerous means in a manner which recklessly places another person in danger of death or serious bodily injury or intentionally fires a firearm in a manner which recklessly places another person in danger of death or serious bodily injury.
(2)  Reckless endangering in the first degree is a class C felony.  There are also laws specific to hunting not applicable here contained in the Hawaii Administrative Rules, title 13, Department of Land and Natural Resources.

46.   Prior to *Bruen*, based upon information and belief, all of the counties,

including Honolulu County, only issued open carry permits for armored

vehicle drivers and not to the general public;

47.   Prior to *Bruen*, the counties had only issued less than a half-dozen carry

concealed permits in the prior decades;[7]

48.   Following *Bruen*, counties in Hawaii promulgated new rules.  County[8]

promulgated rules, attached as Exhibit 2, once in November 2022 and then

again in January 2024[9], of which the following specific rules are at issue

here -

> §21-15-12 Definitions.  Unless the context indicates otherwise,
> as used in this chapter:
>
> "Acquire" has the same meaning as in Section 134-1, Hawaii
> Revised Statutes.
>
> ….

---

[7] *See e.g. Young v. Hawaii*, 896 F.3d 1044, 1071 n.21 (9th Cir. 2018) ("Hawaii counties appear to have issued only *four* concealed carry licenses in the past *eighteen years. See* 2000 Haw. Att'y Gen. Reps., *Firearm Registrations in Hawaii, 2000 et seq*;"). *Young* was vacated and reversed by the U.S. Supreme Court following the *Bruen* decision.

[8] Different counties promulgated different rules at different times.  County promulgated rules in November 2022. County then promulgated rules in January 2024.

[9] Since Plaintiff applied after January 12, 2024, Exhibit 2 is the Honolulu Police Department rules effective January 12, 2024.  The November 2022 rules are not applicable and are not cited or attached herein.

"License to Carry Firearm" and "License" means both Concealed Licenses and Unconceraled Licenses.

….

§21-15-15 Procedures for acquiring and registering firearms. (a) any person attempting to acquire a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, shall appear at the firearms Unit during normal business hours and submit:

….

(2) All completed forms as prescribed by the Honolulu Police Department and the Department of the Attorney General pursuant to Sections 134-2 and 134-3, Hawaii Revised Statutes.

….

(5) Information as provided in subsection (c).

(b) The Firearms Unite shall conduct a background check of the applicant, in accordance with Sections 134-2 and 134-7, Hawaii revised Statutes to ensure the applicant is lawfully permitted to possess or acquire a firearm.

(c) To allow the Chief to determine whether the applicant has "the essential character or temperament to be entrusted with a firearm" pursuant to Section 134-2(e), Hawaii Revised Statutes, and whether the applicant satisfies the requirements of Section 134-7(c) or 134-7(e), Hawaii Revised Statutes, the Chief shall consider:

(1) Information from a health care provider indicating that the person has had suicidal or homicidal thoughts or tendencies within the preceding five years.  To allow the Chief to make this determination, the applicant shall provide:

(A) The completed and signed HIPAA compliant authorization for release of all mental health information, including psychiatric, behavioral health and substance abuse information,

22

from all medical sources, including but not limited to all health care providers, health care plans, clinics, laboratories, pharmacies, medical facilities, other health care providers, and government entities.  The applicant shall also complete any forms required by the applicant's health care provider or relevant government entity for release of mental health information.

(B) The completed and signed State of Hawaii, Adult Mental Health Division Authorization for Use or Disclosure of Protected health Information, if required by the State of Hawaii; and

(C) Information as required by Section 134-2(c)(2), Hawaii Revised Statutes.

….

Subchapter 2

Applications for License to Carry firearm, Concealed or Unconcealed

§21-15-18 Pending Applications. (a) Except as provided in subsections (b) and (c), these rules shall apply to all License applications that are pending on the effective date of these rules, provided that any applicable filing fee shall be the fee in effect at the time the application was filed, and provided further that the one hundred twenty day period provided by Section 134-9(j), Hawaii Revised statutes, shall begin to run on January 1, 2024.

….

§21-15-19  Qualifications, training, and testing to carry and use firearm in a safe manner.

(a) No person who is ineligible for a Permit shall be issued a license.

….

23

(f) Every applicant for a License shall satisfy the requirements of section 21-15-15.  In addition, in determining whether the applicant "presents or would present a danger to the community as a result of carrying a firearm in public" pursuant to Section 134-9(b)(3), Hawaii Revised Statutes, the Chief shall consider the totality of the circumstances, including the following objective factors:

….

(3) Whether the applicant has been involved in incidents of abuse of alcohol, intoxicating liquor, or controlled substances, including but not limited to operating a vehicle under the influence of an intoxicant, within the ten years preceding the application;

…

(5) Any other specific and articulable indicia that would indicate to a reasonable observer, when considering relevant objective factors, that the applicant presents or would present a danger to the community as a result of carrying a firearm in public;

(6) Any other factors provided by law, giving more weight to incidents that are serious or recent, and less weight to incidents that are minor or occurred in the distant past.  For purposes of this section, "involved in" generally requires a conviction or other court ruling; however, the Chief may also consider evidence that the applicant has been repeatedly arrested for or otherwise repeatedly involved in dangerous or violent conduct that would lead a reasonable, objective observer to conclude that the person presents or would present a danger to the community as a result of carrying a firearm in public. The Records and Identification Division may adopt a Manual of procedure to provide additional guidelines in implementing this section.  The Chief may consider information provided as part of the application, as well as

any other information available to the Honolulu Police department or the general public, in making these determinations.  The burden to prove that the applicant "presents or would present a danger to the community as a result of carrying a firearm in public" is on the Honolulu Police Department.  The Chief shall issue a License to an applicant who meets all relevant qualifications unless the Honolulu Police department possesses specific and articulable information demonstrating that the applicant is not entitled to possess a firearm or that the applicant presents or would present a danger to the community as a result of carrying a firearm in public.

§21-15-20 Application procedures for License to Carry Firearm, concealed or unconcealed; Every applicant shall have a mailing address in Hawaii other than a Post office box and shall submit:

(1) The completed Honolulu Police department Application for License to Carry Concealed Firearm or License to Carry Unconcealed Firearm, including an affidavit as required by Section 134-9(d)(5), Hawaii Revised Statutes, any and all forms designated by the Honolulu Police Department to implement Sections 134-2, 134-7 and 134-9, Hawaii Revised Statutes,

....

(3) All forms and documents required by the Honolulu Police Department, including all documentation required by section 21-15-15.

....

(10) Any other forms prescribed by the Department of the Attorney General or the Honolulu Police Department required to complete the background check and mental health screening required by law.

….

§21-15-22 Initial review of application by firearms Unit; background checks. (a) An application is not deemed received by the Honolulu Police department until the complete application, including all required forms and information, is received by the Honolulu Police Department.  The Firearms Unit shall not take further action on an incomplete application except as set forth in subsection (b).  Incomplete applications shall be deemed to have been denied on the 90th day following submission by the applicant, measured from the date of the latest submission by the applicant.

(b) Firearms Unit personnel shall review the application for completeness. If an application is incomplete, Firearms Unit personnel shall advise the applicant as to what information or items are missing, as follows:

(1) if the applicant is present, Firearms Unit personnel shall advise the applicant verbally.  If the applicant provides the missing information and the application is deemed complete, Firearms Unit personnel shall proceed with processing the application.  If the applicant does not provide the missing information upon being advised verbally by firearms Unit personnel, Firearms Unit personnel shall document the verbal guidance given.

(2) if the applicant is not present, Firearms Unit personnel shall advise the applicant in writing.

(c) If the Firearms Unit deems the application to be complete, the Honolulu Police Department shall conduct the following background checks on the applicant:

(1) Local police involvements (current and archive records management systems)

(2) State of Hawaii- Electronic Bench Warrant (EBW) search.

26

(3) CJIS Hawaii query- for Hawaii arrest history and disposition information.

(4) National Instant Criminal Background Check (NCIS) which includes:

(A) National crime Information Center (NCIC) warrants.

(B) Interstate Identification Index (III)- a national index of criminal histories

(C) NICS index- index of persons not eligible to receive firearms in the U.S.

(D) Immigration and Customs enforcement databases- regarding whether the applicant is a citizen, a national, or a lawful permanent resident of the United States.

(E) A query of the State of Hawaii Adult Mental Health Divisions files for State of Hawaii mental health records.

(F) A query of Hawaii's medical marijuana cardholder database to discern whether the applicant holds a medical marijuana permit (*see* U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, "Open letter to all federal firearm licensees," Sept. 21, 2011).

(G) JIMS, eCourt Kokua, Ho'ohiki, or other comparable Hawaii Judiciary databases, for State court orders and records.

(H) Any other databases required by law.

(5) Review of records provided pursuant to section 21-15-15.

(6) In accordance with Section 134-9(h), Hawaii Revised Statutes, review of all objective factors set forth in section 21-15-19(f).

….

(e) Unless the application materials demonstrate, clearly and on their face, that an applicant cannot meet the eligibility criteria set forth in these regulations, each applicant shall be entitled to an interview with Firearms Unit personnel to present any additional information.  ….

(f) The department has discretion to forgo one or more portions of a background check id the Department conducted a full background check of the applicant within the preceding thirty days.

….

§21-15-25 Chief's Decision on application for License to Carry Firearm, concealed or unconcealed.  (a) The Firearms Unit shall forward the applicant's background check results, application, all attachments, and a cover memo noting all findings to the Chief for the Chief's review and decision.

(b) For applications for Concealed Licenses, the Chief shall evaluate whether the applicant meets the objective criteria as required under Hawaii law and as set forth herein.  The Chief shall consider prohibitions and standards found in Sections 134-2, 134-7 and 134-9, Hawaii Revised Statutes, including age, criminal history, and mental health, and the standards set forth in these rules.  If the applicant does not satisfy these criteria, the application shall be denied on that basis.

….

(d) The Chief and Honolulu Police Department personnel shall consider each application based on the facts and circumstances of each applicant.  The Chief and Honolulu Police Department personnel shall not act arbitrarily or capriciously and shall not reject applications based merely on preconceived notions or beliefs.  All decisions to grant or deny applications shall be based on an objective application of the defined criteria set forth herein.

(e) If, at any time during the Chief's processing of an application, the Chief feels that the applicant may be able to meet the eligibility criteria but further information or clarification is needed before the Chief is able to make a final decision, Firearms Unit personnel shall invite the applicant to submit additional information.

(f) Upon the Chief reaching a decision, the applicant shall be sent a written decision.

….

(g ) If an application for a License is denied, the denial letter shall set forth the facts of the application and explain the reasons for the denial based on Sections 134-2, 134-7 or 134-9, Hawaii Revised Statutes, the standards and factors described in these rules, or any other source of applicable law.

….

Subchapter 4

General Provisions

§15-20-31 Purpose and Intent; severability. (a) These rules are intended to govern the processing of applications for Permits to Acquire, to Register a firearm, and for Licenses to carry Firearm, concealed or unconcealed, by the Honolulu Police department, and shall be complied with by Honolulu Police department personnel, including the Chief of Police.

(b) ….These rules shall be construed to be enforceable up to, but no further than, the maximum possible extent consistent with federal and state law.

(c) Where these rules repeat the requirements of state law, the Honolulu Police department is not adopting those requirements as its own policy.  Instead, the Honolulu Police

29

department is including those requirements solely for ease of reference for its officers and applicants.

**V**

**<u>Plaintiff JOHN TERRY</u>**

49.  Plaintiff John Terry realleges and incorporates by reference all of the foregoing allegations of this complaint;

50.  Plaintiff John Terry challenges County's custom, policy, rule, or practice of delay or denial in the issuance of his CCW license based on HPD's demand that he provide a new or more recent so-called "medical clearance" letter;

51.  Plaintiff Terry challenges County's custom, policy, rule or practice of unfettered and arbitrary discretion in the issuance of his CCW license;

52.  Plaintiff Terry challenges County's custom, policy, rule or practice of ultra vires actions, including delay and or denial, in the issuance of his CCW license based on the demand for a new or more recent so-called "medical clearance" letter;

53.  Plaintiff Terry is a U.S. citizen, a male, and a resident of Honolulu County;

54.  Plaintiff Terry legally owns multiple firearms;

55.  Plaintiff Terry is not disqualified under Hawaii or federal law from owning, possessing or carrying a firearm, including in a concealed manner;

56.  Plaintiff Terry has completed all requirements under Hawaii law and County regulation to be issued a CCW license;

57. Plaintiff Terry does not currently suffer from any substance abuse issue which would disqualify him from obtaining a CCW license.

58. Plaintiff Terry does not suffer from any psychiatric issues which would disqualify him from obtaining a CCW license.

59.  Plaintiff Terry applied for a CCW by submitting all necessary paperwork to County on or about April 29, 2024;

60.  Plaintiff Terry was told by HPD when he applied for his CCW that he needed to provide a new or more recent so-called "medical clearance" letter and or a letter to "re-certify" that he is no longer adversely affected by a condition for which he had previously sought counseling and or treatment and was given a document outlining that the HPD demanded a new so-called "medical clearance letter". *See* Exhibit 3;

61.  Plaintiff Terry holds a Class III Federal Firearms License, (FFL), and has held that license since about 2015;

62.  Fourteen years ago, in 2010, Plaintiff Terry believed that he had an issue with alcohol and voluntarily sought and obtained counseling and treatment to treat this perceived issue with alcohol;

63.  Since seeking treatment, Plaintiff Terry has not consumed alcohol;

64. Plaintiff, in the process of acquiring a firearm, in 2015, in Honolulu, as part of the Permit to Acquire process, provided HPD with a so-called "medical clearance letter", more than once, that stated that Plaintiff Terry was no longer adversely affected by any condition that he had previously sought treatment and or counseling for, specifically, the consumption of alcohol.  That clearance letter is still with County;

65. Plaintiff Terry is a curio and relics collector;

66. Plaintiff Terry regularly buys, and acquires firearms and items which would qualify as firearms under HRS 134-1;

67.  Plaintiff Terry regularly buys functioning firearms;

68. Plaintiff Terry has many firearms that qualify as curios and relics;

69. Plaintiff Terry has many firearms that are functioning firearms that are not curios and relics including many long guns and many handguns;

70. Plaintiff Terry's prior so-called "medical clearance" letter was provided to the HPD about no later than 2017;

71. Defendant County required Plaintiff Terry to obtain a new so-called "medical clearance" letter and submit it before continuing to process or grant his CCW application;

72. Plaintiff Terry is currently employed at Joint Base Pearl Harbor Hickam as an Asset Safety Officer;

73. Plaintiff Terry can currently acquire, own and possess firearms without the need for a renewed, or new so-called "medical clearance" letter;

74. Plaintiff Terry currently legally owns many firearms;

75. In order to obtain a Federal Firearm License (FFL), Plaintiff Terry had to undergo a background check;

76. Plaintiff Terry is not disqualified from owning or carrying a firearm concealed under any federal or state law nor any County rule;

77. Plaintiff Terry has completed and complied with all necessary federal, state and County requirements to obtain a CCW, except for County's unauthorized demand for a new so-called "medical clearance" letter;

78. Plaintiff Terry submitted all necessary paperwork for a CCW to County, except for the demanded new so-called "medical clearance" letter, on or about April 29, 2024;

79. At the time Plaintiff Terry submitted his CCW application to County, on or about April 29, 2024, an HPD employee informed Plaintiff Terry that he must provide a new so-called "medical clearance" letter to "re-certify" that Plaintiff Terry was no longer adversely affected by an alcohol issue. *See* Exhibit 3;

80. There is no Hawaii State law under HRS 134 *et seq,* or anywhere else in Hawaii state law, that requires or authorizes County to demand[10] any applicant for a CCW and or PTA provide a new, or more recent so-called "medical clearance" letter or to otherwise provide documentation to "re-certify" that he is not disqualified to acquire, own, possess, or carry concealed or otherwise, an arm;

---

[10] Or delay or deny a CCW and or PTA on that basis.

81.  There is no County HPD rule that requires or authorizes HPD to demand[11] any applicant for a CCW provide a new, or more recent so-called "medical clearance" letter or to otherwise provide documentation to "re-certify" that he is not disqualified to acquire, own, possess, or carry concealed or otherwise, an arm;

82.  On or about April 29, 2024, Terry visited the HPD website and printed and completed the License to Carry Firearm forms;

83.  On or about April 29, 2024, Terry, armed with the completed HPD forms, took the forms and a letter from Dr. Beardsley and his identification and visited the HPD main police station on Beretania and went to the Firearms section, *see* Exhibit 4;

84.  Terry told an officer behind the service window that he was applying for a license to carry;

85.  The HPD officer told Terry to have a seat and that someone would assist him;

---

[11] Or delay or deny a CCW and or PTA on that basis.

86. HPD officer Corporal J. Correy approached Terry and confirmed that Terry was applying for a permit to carry;

87. Terry gave Correy the completed forms and the letter from Beardsley;

88. Corporal Correy reviewed Terry's paperwork and then told Terry that the letter from Dr. Beardsley was not adequate for use when applying for a License to Carry Firearm;

89. Terry asked Correy what information Correy needed to process the License to carry application;

90. In response to Terry's question, Correy handed Terry Exhibit 3 and Correy said that he had sent that form, Exhibit 3, to other applicants outlining the requirements;

91. Terry asked Correy about the two handwritten notations on Exhibit 3, and Correy told Terry "yes" the letter from Terry's doctor had to say in writing that the doctor's visit was at least 45 minutes long and that the doctor needs to put in the letter that Terry was "mentally fit to carry a firearm in public";

92. Correy asked Terry to get the updated letter to Corey in thirty days;

93.  After the conversation, Terry had to pay the fee and since HPD would not accept checks or credit cards, Correy directed Terry to a nearby ATM and once Terry submitted the cash, Correy provided Terry with a receipt, see Exhibit 5;

94.  Plaintiff Terry owns other handguns and plans to apply for other CCW licenses in the future with the other handguns;

## Plaintiff MICHAEL A. COBB JR.

95.  Plaintiff Michael A. Cobb Jr. realleges and incorporates by reference all of the foregoing allegations of this complaint;

96.  Plaintiff Michael A. Cobb Jr. challenges County's custom, policy, rule, or practice of delay or denial in the issuance of his PTA license based on HPD's demand that he provide a new or more recent so-called "medical clearance" letter;

97.  Plaintiff Cobb challenges County's custom, policy, rule or practice of ultra vires actions, including delay and or denial, in the issuance of his PTA license based on the demand of a new or more recent so-called "medical clearance" letter. Specifically, he challenges County's policy of requiring an additional medical clearance simply because the license of the doctor who

issued the prior medical clearance has expired when HPD already has a copy of that medical clearance;

98. Plaintiff Cobb is a U.S. citizen, a male, and a resident of Honolulu County;

99.  Plaintiff Cobb legally owns multiple firearms;

100.  Plaintiff Cobb is not disqualified under Hawaii or federal law from owning, possessing or carrying a firearm, including in a concealed manner;

101.  Plaintiff Cobb has completed all requirements under Hawaii law and County regulation to be issued a PTA;

102. Plaintiff Cobb does not currently suffer from any disqualifying condition which would disqualify him from obtaining a PTA.

103. Plaintiff Cobb does not suffer from any psychiatric issues which would disqualify him from obtaining a PTA.

104.  Plaintiff Cobb applied for a PTA by submitting all necessary paperwork to County on or about April 15, 2024;

105.  Plaintiff Cobb, on or about April 15, 2024, completed all forms necessary for a PTA and visited the HPD main police station on Beretania to submit the PTA;

106.  Plaintiff Cobb, on or about April 15, 2024, to submit his PTA, visited the HPD main police station with his wife Myrna Cobb;

107. Myrna Cobb has a firearm registered to her with HPD. *See* Exhibit 6;

108. Myrna Cobb has several firearms jointly registered with Plaintiff Cobb;

109. Plaintiff Cobb and Myrna Cobb went, on or about April 15, 2024, to the HPD main police station to obtain a PTA to acquire a firearm for Plaintiff Cobb;

110. Plaintiff Cobb, along with Myrna Cobb, submitted all necessary forms, along with a so-called "medical clearance letter", to a female HPD police officer. *See* Exhibit 7;

111. The female HPD officer reviewed Cobb's documentation and told Plaintiff Cobb that his medical clearance letter was "no longer valid" because the doctor's certification had expired;

112. Cobb questioned the female HPD officer why the letter would not be "valid";

113. The HPD female officer's response to Cobb was because the doctor's license had expired previously;

114. The HPD female officer told Cobb to obtain a new letter from the same facility;

115. The HPD female officer told Cobb that getting the new medical clearance letter should not be a problem because she, the female HPD officer, had told other applicants to go to the same facility for so-called "medical clearance" letters;

116. Cobb immediately went to the same facility that had provided him with Exhibit 7 and requested and obtained a letter that contained one change, from "…expiration date 01/31/24."  to "…expiration date 01/31/26.";

117. When Cobb went to the facility to obtain a new medical clearance letter at HPD police officer's demand, the facility took the same letter, with the same date of issue, December 28, 2021, and merely changed the last portion of the last sentence as described above, changing the "expiration date" of the

licensed mental health professional's MD license number, from January 31, 2024 to January 31, 2026;

118. Cobb's two medical clearance letters, Exhibit 7 and Exhibit 8, issued from the same facility, bear the same issuance date, December 28, 2021;

119. Based upon information and belief, the facility and medical doctor that provided Cobb's medical clearance letters, no longer provides firearm medical clearance letters;

120. Cobb then returned to the HPD main station and met the same female HPD officer and provided her with the new clearance letter. *See* Exhibit 8.

121. After having received Cobb's new letter, Exhibit 8, the female HPD officer told Cobb that the new letter was acceptable and took all of Cobb's documents;

122. Cobb later received a PTA;

123. Cobb's initial clearance letter was based upon counseling that occurred when Cobb was a minor;

124. Cobb has multiple firearms that he has owned prior to April 2024;

125. Cobb provided his original so-called "medical clearance letter" in or about 2021;

126. Plaintiff Cobb is currently employed at Kaiser;

127. Plaintiff Cobb can currently legally acquire, own and possess firearms without the need for a renewed, or new so-called "medical clearance" letter;

128. Plaintiff Cobb is not disqualified from owning or carrying a firearm concealed under any federal or state law nor any County rule;

129. Plaintiff Cobb had originally submitted all necessary paperwork for a PTA to County, except for the demanded new so-called "medical clearance" letter, on or about April 15, 2024;

130. At the time Plaintiff Cobb submitted his PTA application to County, on or about April 15, 2024, the first time, Defendant had no information to believe that Cobb needed a new co-called "medical clearance" letter;

131.  There is no Hawaii State law under HRS 134 *et seq,* or anywhere else in Hawaii state law, that requires or authorizes County to demand[12] any applicant for a CCW and or PTA provide a new, or more recent so-called

---

[12] Or delay or deny a CCW and or PTA on that basis.

42

"medical clearance" letter or to otherwise provide documentation to "re-certify" that he is not disqualified to acquire, own, possess, or carry concealed or otherwise, an arm;

132.  There is no County HPD rule that requires or authorizes HPD to demand[13] any applicant for a PTA and or CCW to provide a new, or more recent so-called "medical clearance" letter or to otherwise provide documentation to "re-certify" that he is not disqualified to acquire, own, possess, or carry concealed or otherwise, an arm;

133. Upon information and belief, Defendant has a record of Exhibit 8;

134. Cobb buys and intends to buy one to two firearms a year and will continue to do so;

135. The license of the medical doctor who issued Cobb's medical clearance letter will expire in 2026;

136.  The average civil case in Hawaii takes an average of 41.2 months to resolve, *see* Table N/A—U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (June 30, 2023) 2, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile

---

[13] Or delay or deny a CCW and or PTA on that basis.

0630.2023.pdf[14] at page 70 (Government's statistics on length of court proceedings in Hawaii);

# VI

# CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNITED STATES CONSTITUTION AMENDMENTS II AND XIV RIGHT TO BEAR ARMS 42 U.S.C. §1983

137.  Plaintiffs hereby re-allege and incorporate by reference the allegations in the forgoing paragraphs as if set forth fully herein;

138.  Plaintiffs do not concede that any Hawaii Revised Statute or County code or policy, practice, habit, custom, or rule is constitutional;

139.  Plaintiffs allege that County's requirement[15] of a new so-called "medical clearance letter" before their PTA and or CCW application shall be processed and or their PTA and or CCW application granted, has violated their Second and Fourteenth Amendment U.S. Constitutional rights;

140.  Historically, only people who were deemed dangerous[16], after a sufficiently robust judicial proceeding could have their Second Amendment rights restricted. "The burden Section 922(g)(8) imposes on the right to bear

---

[14] Last accessed June 22, 2024.
[15] Policy, practice, habit or custom.
[16] At the time of their carrying of an arm. Typically, this was for a temporary time.

arms also fits within our regulatory tradition. …., we note that Section 922(g)(8) applies only once a court has found that the defendant "represents a credible threat to the physical safety" of another. §922(g)(8)(C)(i). That matches the surety and going armed laws, which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *United States v. Rahimi*, 2024 WL 3074728 (United States Supreme Court June 23, 2024);

141. County has no evidence that Plaintiff Terry or Plaintiff Cobb is currently dangerous or sufficiently dangerous to prohibit their ownership or carriage, in any manner, of an arm, under either Hawaii State law or County rule, and County did not have any evidence on the day that Plaintiffs applied;

142. County has no evidence that Plaintiff Terry or Plaintiff Cobb currently suffer from any substance abuse issue or any other disqualifying condition, and did not have any evidence on the day Plaintiffs applied;

143. County has evidence that Plaintiff Terry does not suffer a substance abuse issue in the form of the medical clearance letter it previously received, and that Plaintiff Cobb does not suffer from a disqualifying condition based upon Exhibit 7 that it possessed prior to April 15, 2024;

144.  Plaintiffs allege that County's delay and or denial of their PTA and or CCW application pending receipt of a new so-called "medical clearance letter", from Plaintiffs, when the HPD already has a so-called "medical clearance letter" on file for each Plaintiff and or no evidence to prove that Plaintiffs currently adversely suffer from addiction to, abuse of, or dependence upon any dangerous, harmful, or detrimental drug, intoxicating compound as defined in section 712-1240, or intoxicating liquor, and or any other disqualifying condition, violates their Second and Fourteenth Amendment rights;

145. County's policy of requiring an additional medical clearance independently violates the Second Amendment because it is ultra vires.

146. County derives its authority to regulate firearms use from state law. Haw. Rev. Stat. § 134-7 only restricts firearms rights until a person is medically cleared that he "is no longer adversely affected" from alcohol use and or some other disqualifying condition.  Thus, HPD's conduct is ultra vires. Ultra vires conduct is inherently arbitrary. *See Cine SK8, Inc. v. Town of Henrietta* 507 F.3d 778, 790 (2d Cir. 2007).

147. *Bruen* commands that the government may not act in an arbitrary manner in making determinations on Second Amendment rights.  *See Bruen*, 147 S. Ct. at 2138 n.9. (Prohibiting governments from engaging in the

"appraisal of facts, the exercise of judgment, and the formation of an opinion".)

148. Arbitrary government action is caused by unfettered discretion and thus violates the Second Amendment.

## VII

## CLAIM FOR DECLARATIVE AND INJUNCTIVE RELIEF UNITED STATES CONSTITUTION AMEND XIV PROCEDURAL DUE PROCESS

149.  Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if set forth herein;

150.  Plaintiffs have a right to procedural due process;

151.  Plaintiffs do not concede that any permit is required to acquire and or carry an arm, openly or concealed under the U.S. Constitution;

152.  To the extent that a permit or license is needed to acquire and or carry an arm openly or concealed, at present, the issuance of such a license or permit must be based on procedures that comply with due process;

153.  County's demand that Plaintiffs obtain and submit a new, more recent so-called "medical clearance" letter, or otherwise "re-certify" their previous, already in the possession of HPD, so-called "medical

47

clearance" letter, is just an effort to delay and or deny the issuance of

the PTA and or CCW and or place onerous, time-consuming, and costly

roadblocks in the way of the issuance of the PTA and or CCW;

154.  County, by demanding that Plaintiffs "re-certify" their so-called

"medical clearance", has flipped *Bruen* on its head.  Instead of placing

some minimal objective limitation on unconcealed carry and being a

true "shall issue" jurisdiction with regard to concealed carry, County

has ensured that applications, for PTA and concealed carry, CCW, will

require applicants to "re-certify" and re-prove already proven facts[17].

## VIII

## (DECLARATORY JUDGMENT)

155.   Plaintiffs repeat and reallege the allegations of the preceding

paragraphs as if set forth herein;

156.  The Declaratory Judgment Act provides: "In a case of actual

controversy within its jurisdiction, any court of the United States may

declare the rights and other legal relations of any interested party seeking

such declaration, whether or not further relief is or could be sought." 28

U.S.C. 2201(a);

---

[17] This also flips the burden, ostensibly in the HPD rules, that the burden is on the HPD to disqualify the applicant.

157. Absent a declaratory judgment, there is a substantial likelihood that Plaintiffs will suffer irreparable injury in the future;

158. There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment;

159. This Court possesses an independent basis for jurisdiction over the parties;

160. Plaintiffs seek a judgment declaring that Defendant's customs, policies, rules and or practices, demanding to "re-certify" or provide a more recent so-called "medical clearance" letter which denies Plaintiffs their Second Amendment rights to acquire and carry arms in case of confrontation, are unconstitutional under the Second Amendment;

161. Alternatively, a declaration that County's customs, policies, rules and or practices are unconstitutional as applied to Plaintiffs;

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs requests that judgment be entered in their favor and against Defendant as follows:

1. An order preliminarily and permanently enjoining Defendant, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction,

from enforcing Defendant's policies, rules, customs, or practices complained about above, both facially and as applied to Plaintiffs;

2.  Declaratory relief that the complained of County customs, policies, rules and or practices are unconstitutional, both facially and as applied to Plaintiffs;

3.  An order compelling County to process Plaintiffs' future applications immediately without submitting an additional "medical clearance" letter;

4.  An order compelling County to process all applications for PTA and CCW, wherein the HPD already has received a "medical clearance" without the need for an additional or updated medical clearance letter;

5.  Awarding Plaintiffs' attorney fees and costs pursuant to 42 U.S.C. §1988;

6.  Nominal Damages.

7.  Such other relief consistent with the injunction as appropriate; and

8.  Such other further relief as the Court deems just and appropriate.

Dated: June 26, 2024.

Respectfully submitted,

/s/ *Kevin O'Grady*

Kevin Gerard O'Grady

Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com


/s/ *Alan Beck*

Alan Alexander Beck

Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com
Counsel for Plaintiffs

## VERIFICATION

I, John Terry, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on June 22, 2024

_____

JOHN TERRY

# VERIFICATION

I, Michael A. Cobb Jr. declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on June 22, 2024

_Michael A. Cobb_

**MICHAEL A. COBB JR.**